# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 29, 2026

Lyle W. Cayce
Clerk

No. 25-20087

Cyanco International, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Minerales de Occidente, S.A. de C.V.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:23-CV-3713

Before Smith, Stewart, and Haynes, *Circuit Judges*:

Jerry E. Smith, *Circuit Judge*:[*]

Minerales de Occidente, S.A. de C.V. ("Minosa"), an open-pit heap-leach mining company, contracted with Cyanco International, L.L.C. ("Cyanco"), a producer of sodium cyanide, to purchase its annual requirement of sodium cyanide. The contract required each party "to maintain all licenses, permits, authorizations and registrations required to be held by each Party under applicable Laws for purposes of manufacturing, transporting,

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

using, handling and disposing of" sodium cyanide and stated that the "Seller agrees to maintain export licenses for the Mine Site and [the] Buyer agrees to maintain import licenses and meet all regulatory requirements to permit the Seller's sale of the Product to the Buyer."

It is undisputed that Cyanco initially complied with those provisions, seeking and securing an export license from the Bureau of Industry and Security ("BIS") in 2019. The export license had a validity period of approximately four years and permitted Cyanco to export 8,000 metric tons of sodium cyanide to Minosa. The contract was amended multiple times. The final contract provided that 100% of Minosa's requirements, up to 5,400 metric tons each year, was to be purchased from Cyanco. An amendment also provided that any dispute would be settled under the laws of Texas.

On March 30, 2023, Minosa sent Cyanco a letter entitled "Notice of Breach." The letter accused Cyanco of breaching the contract by shipping "at least 10,640 metric tons" of sodium cyanide to Minosa, more than 2,000 metric tons in excess of the amount allotted on Cyanco's BIS license. The letter stated that Cyanco was in violation of the two contractual provisions and requested that Cyanco "take immediate action to remedy the Default and perform its obligations in accordance with the Contract." Following that letter, and per the contract's 30-day curing provision, Cyanco pursued and received an additional export license from the BIS on April 14, 2023, permitting Cyanco to export 24,000 metric tons to Minosa. But Cyanco did not explicitly tell Minosa of the new BIS license until June 2023, after the BIS had closed its investigation of Cyanco and had decided only to issue a warning letter.

In the period between the issuance of the license and Cyanco's explicitly informing Minosa of the license, the parties exchanged a series of letters. On April 19, 2023, Minosa sent a Notice of Termination ("NoT"). In the

NoT, Minosa cited violation of the aforementioned contractual provisions on account of Cyanco's exceeding the quantity listed on the license and 15 C.F.R. § 764.2, which prevents prohibits buyers from engaging in transactions that are contrary to the Export Administration Regulations ("EAR") and from buying goods with "knowledge that a violation of ECRA, the EAR, or any order, license, or authorization issued thereunder, has occurred, is about to occur, or is intended to occur in connection with the item." Minosa also informed Cyanco that it intended to purchase sodium cyanide from another supplier.

Minosa purports to have terminated the contract effective May 19, 2023. Cyanco responded on April 26, 2023, denying that it had breached the contract. More specifically, Cyanco said that it "has fully discharged its obligation to deliver Product to Buyer and stands ready to continue to do so." The letters continued back and forth, with both parties' reiterating similar points, save for the final exchange in which Cyanco accused Minosa of breaching the contract by purchasing sodium cyanide from another supplier. The letter explained Cyanco's procurement of the license in April and the content of the BIS Warning Letter. Minosa responded by claiming that Cyanco's failure to maintain the license was "a material incurable breach."

Following that exchange, Cyanco sued Minosa for breach of contract. Minosa moved for summary judgment, alleging that Cyanco had failed to maintain its export license when it shipped excess sodium cyanide and that violation of the contract was incurable. The district court denied the motion for summary judgment and a subsequent summary judgment motion by Minosa based on an unsworn expert report. At a pre-trial hearing about ten days before trial, the court reconsidered the denial of summary judgment *sua sponte*, ruling that Minosa was entitled to summary judgment.

Cyanco appeals, contending (1) that it maintained its export license

3

and thus did not breach the contract; (2) even if it did breach the contract, it timely cured that breach pursuant to the cure provision in the contract; and (3) any breach that did occur was not material and did not excuse Minosa's performance.  We reverse and remand.

## I.

The threshold question under Texas law, at the summary judgment stage, is whether the contractual provisions are ambiguous.  If the "contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).  Whether a contract is ambiguous is a question of law for the court. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980).  An ambiguity exists where a contract's "meaning is uncertain and doubtful or it is reasonably susceptible to more than one interpretation." *In re Davenport*, 522 S.W.3d 452, 456 (Tex. 2017).  "[A] contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 119 (Tex. 2015).

"When construing a contract, the terms are typically given 'their plain, ordinary, and generally excepted meaning.'" *In re Davenport*, 522 S.W.3d at 456–57 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).  Courts can look to dictionaries to discern the meaning of a commonly used term that isn't defined in the contract. *Id.* at 457.  Unambiguous documents are enforced as written. *Id.*

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker*, 650 S.W.2d at 393.  A court should "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the

4

contract so that none will be rendered meaningless." *Id*. "No single provision taken alone will be given controlling effect; instead, all the provisions must be considered with reference to the whole instrument." *Id.*

The relevant contractual provisions state the following:

§ 12.2 ("Licenses and Registrations"): The Buyer and Seller [Cyanco] agree to maintain all licenses, permits, authorizations and registrations required to be held by each Party under applicable Laws for purposes of manufacturing, transporting, using, handling and disposing of Product.

§ 4.5: Seller agrees to maintain export licenses for the Mine Site and Buyer agrees to maintain import licenses and meet all regulatory requirements to permit the Seller's sale of the Product to the Buyer.

The parties contend that this breach-of-contract claim is about the meaning of "maintain." There are two definitions of "maintain" put forward: one by the district court and one by Cyanco. The definition of "maintain" used by the court comes from *Big Three Welding Equipment Co. v. Cruther, Rolfs, Cummings, Inc.*, 229 S.W.2d 600 (Tex. 1950). That definition defines "maintain" as "[t]o keep up, preserve, bear the cost of, keep unimpaired, [or] keep in good order." *Id.* at 603 (citing BLACK'S LAW DICTIONARY, 3d ed., at 1143). Cyanco also pull their definition from *Big Three*'s stating that to "maintain" a license is to "hold or keep in any particular state or condition especially in a state of efficiency or validity." *Id.*

Although both definitions are plausible, the interpretation of "maintain" does not make a difference with regard to Cyanco's alleged breach, meaning that the contract is unambiguous and the matter of breach, at least in the first instance, can be resolved as a matter of law. Cyanco suggests that if "maintain[ing]" a license means to keep it valid, then it did not violate the contractual provision because the quantity number goes not to the validity of

5

the license but to the scope of the license. But even if that is so, the contractual provision requires Cyanco to "maintain *all* licenses . . . required to be held by each Party under applicable Laws." On that language, it is not sufficient that a license be valid, but also that all required licenses be valid (and thus sufficient) under federal law.

When Cyanco exceeded the quantity term of the contract, it ceased to hold a valid license as to the 2600 metric tons of sodium cyanide that it mistakenly had sent to Minosa. In other words, there was a requirement under federal law that Cyanco have a license to export the 2600 metric tons and that that license would fit into the category of "all licenses . . . required to be held by each Party under applicable Laws"; therefore, the validity of the license still in existence is irrelevant as to the 2600 metric tons. Cyanco needed a separate license (or at least an adjusted license) to distribute the remaining sodium cyanide. The BIS's issuance of a license that retroactively covered the excess sodium cyanide bolsters that conclusion, as it makes clear that any exported sodium cyanide needed to be associated with a related license. As a consequence of the above understanding, there is no genuine dispute of material fact as to whether Cyanco breached the contract.

## II.

With the question of breach addressed, we ask whether there is a genuine dispute of material fact regarding Cyanco's attempted cure of the breach. Section 1.3 of the Sales Contract, the termination clause, states:

> This contract may be terminated by a Party with thirty (30) days prior written notice (without prejudice to its other rights and remedies) if the other Party . . . is in breach of any term of this Contract, including failure to pay, and fails to remedy such breach within thirty (30) days after its receipt of written notice detailing the breach from the non-breaching Party.

The district court found that Minosa did not breach by terminating the

6

contract because it offered "a plethora of authority for the proposition that a failure to maintain something amounts to an incurable breach of contract in similar contexts where that failure resulted in a violation of the law." Cyanco urges that the BIS letter explicitly provides retroactive coverage for the shipments that were in violation of federal law and that Minosa's "plethora of authority" are inapposite and decided under the law of other jurisdictions.

Cyanco is completely correct. First, not one of the authorities cited by Minosa is under Texas law. A federal court sitting in diversity has a responsibility to apply the substantive law of the state in which it sits, not the law of other forums. Likewise, where there is a valid choice-of-law clause, as is uncontested in this case, the court must apply the law designated in that clause. If Texas has no law on the matter, then the most that the district court should have done is engage in an *Erie* guess to determine whether a *per se* rule of that nature was appropriate under Texas law. Such a *per se* rule was inappropriate, at least based on the sources cited by the district court.

*Federal Engineers & Contractors v. Relyant Global* was based wholly on a contractual provision that permitted instant termination in the case of a violation of the law.[1] *Ag Tech Scientific v. Blue Circle Development* cites no authority regarding incurable breach beyond noting that a party need not comply with the provision when the breach is incurable.[2] *D&D Realty Trust v. Borgeson* involved an attempt to cure well after the thirty-day cure provision in the lease.[3] *Kyung Sik Kim v. Idylwood, N.Y., LLC*, held that a failure to maintain insurance was not cured by obtaining prospective insurance coverage because it exposed the other party to liability during the noncover-

---

[1] No. 3:19-CV-73, 2022 WL 19763248, at *4 (E.D. Tenn. Aug. 11, 2022).

[2] No. 5:19-CV-00118-GFVT, 2020 WL 1975375 (E.D. Ky. Apr. 24, 2020), at *3–4.

[3] 2015 Mass. App. Div. 115 (Dist. Ct. 2015), at *1.

age period.[4]  That is not factually analogous, given that the BIS letter indicates that the new license retroactively covered the once illegal shipments, meaning that the district court's rule was too broad, even if this case was binding.  Lastly, *Las Americas, Inc. v. American Indian Neighborhood Development Corp.* does not even indicate that there was a cure provision in the underlying contract.[5]

 Given that *Erie* guesses are not meant to "adopt innovative theories of state law" but aim "to apply that law as it currently exists," it is implausible that the district court's ruling, cobbled together from precedents across the country, would be a satisfactory *Erie* guess.  *Weatherly v. Pershing, L.L.C.*, 945 F.3d 915, 920 (5th Cir. 2019).  None of those sources draws its legal conclusions from sources of law that are shared by Texas, and the district court made no attempt to harmonize them with Texas law.  Furthermore, none of those cases is factually analogous.

Because the breach was not uncurable as a matter of Texas law, it must be determined whether Cyanco raises a genuine dispute of material fact.  Cyanco claims that the BIS letter confirms that Cyanco cured its violation by obtaining the new license.  The BIS letter states that "excess exports as well [as] future exports will be under this new license."  Cyanco says that is proof positive that it, in fact, is possible to cure the breach, as the retroactive effect covered the illegal shipments.  Taking all reasonable inferences in favor of the non-moving party, this raises a genuine dispute of material fact and precludes summary judgment.

Minosa, for its part, claims that even if Cyanco did not breach as a matter of Texas law on the district court's reasoning, "'maintain' connotes

_____

[4] 886 N.Y.S.2d 337 (2009).

[5] 2004 WL 2710061 (Minn. Ct. App. 2004).

a lack of interruption," meaning that the lapse that occurred could not be cured. The only authority Minosa cites for that proposition is a concurrence from a Texas intermediate appellate court.[6] While it is certainly possible that "maintain" could mean a lack of interruption, based solely on that court case and the dictionary definitions provided above, it is not evident that "maintain," as a matter of law, must mean that.

Considering that contractual provisions are to be in reference to the whole instrument, the existence of a general cure provision implies that any such incurable breach would be noted in the contract or apparent on the face of the breach itself. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). At the summary judgment stage, that is sufficient to reverse because the ambiguity creates a fact issue, which must be resolved by the factfinder, even on Minosa's own theory.

Minosa also claims that Cyanco provided no justification for its alleged failure to notify Minosa that it had cured the breach. Minosa fails, however, to allege anything that would entitle it to summary judgment. It at no point claims that, as a matter of law, such notice was required, so it falls short of arguing that Cyanco failed to raise a genuine dispute of material fact.

## III.

In determining whether a breach is material, Texas courts consult the Restatement (Second) of Contracts. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004). The Restatement states that there are five factors to engage with when determining whether a failure to perform is material:

---

[6] *See Bartlett v. Bartlett*, 465 S.W.3d 745, 757 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (Frost, C.J., concurring) ("The contractual language provides that the grade-point average was to be 'maintained,' meaning met on an uninterrupted basis.").

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241 (A.L.I. 1981).

"Generally, materiality is an issue 'to be determined by the trier of facts.'" *Bartush-Schnitzius Foods Co. v. Cimco Refrig., Inc.*, 518 S.W.3d 432, 436 (Tex. 2017). Like other issues of fact, materiality may be decided as a matter of law only if reasonable jurors could reach only one verdict. *Id.*

The district court stated that there was no genuine dispute of material fact "with regards to whether Cyanco materially breached the Contract, as Cyanco shipped in excess of the Export License limits, and Minosa had clear directions from the EAR that it was no longer permitted to purchase from Cyanco." The provision of the EAR in question states the following:

No person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, or conduct negotiations to facilitate such activities with respect to, any item that has been, is being, or is about to be exported, reexported, or transferred (in-country), or that is otherwise subject to the EAR, with knowledge that a violation of ECRA, the EAR, or any order, license, or authorization issued thereunder, has occurred, is

10

about to occur, or is intended to occur in connection with the item.

15 C.F.R. § 764.2(e)

The district court's conclusion that there was material breach as a matter of law is without support and is contradicted by the BIS Warning Letter. Importantly, the court cites no authority for the proposition that § 764.2(e) forbids Minosa from continuing to deal with Cyanco. The court's interpretation is, presumptively, based on a reading of the "has occurred" language, understanding it to preclude Minosa from ever conducting business with Cyanco again as a violation "has occurred" by the admission of all parties. But that rendition contradicted by a close reading of the regulatory text and the BIS Warning Letter, and neither the district court nor Minosa cites Texas law for the proposition that a violation of the law is a *per se* material breach.

In § 764.2(e), the limitation imposed on buying has multiple elements. First, the buying must be with respect to an item subject to the EAR. Second, the buyer must have knowledge of a past, present, or future violation of the relevant law. Lastly, the knowledge of a violation must be in relation to an item. The word "item" is admittedly ambiguous, but when considered in conjunction with the rest of the provision, the most probable reading is that the knowing violation is with regard to discrete violative exports, rather than that word's referring to the category of items that were violatively exported. On the alternate reading, it is unclear how Minosa would be able to purchase sodium cyanide from another supplier, as it still would have knowledge that a violation had occurred in connection with sodium cyanide.

The BIS Warning Letter strengthens this interpretation, stating that "excess exports . . . and future exports will be under this new license." The nature of the export license provided to Cyanco only permits it to export

sodium cyanide to Minosa. That fact, alone, is far from dispositive but does suggest that the BIS does not consider § 764.2(e) to pose a barrier to Minosa and Cyanco's relationship.

Minosa also raises an impracticability argument, but that theory, like the reasoning from the district court, relies on the proposition that "federal regulations prohibited Minosa from ordering any additional solid sodium cyanide from Cyanco with knowledge that a violation of the EAR had occurred or would occur." Absent the district court's interpretation of § 764.2(e), Minosa's impracticability argument has no basis.

Cyanco did not commit material breach as a matter of law. As a result, Cyanco raises a genuine dispute of material fact with regard to materiality because "materiality is [generally] an issue 'to be determined by the trier of facts.'" *Cimco Refrig.*, 518 S.W.3d at 436. Cyanco has alleged enough to allow a reasonable factfinder to conclude that it did not breach materially, as a reasonable factfinder could find that a cure occurred before Minosa would place an order for another shipment and that the cure retroactively covered the past forbidden conduct.

The summary judgment is REVERSED and REMANDED.